

1998 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-31-1998

# Fair Housing Cncl v. Main Line Times

Precedential or Non-Precedential:

Docket 97-1169

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1998

Recommended Citation

"Fair Housing Cncl v. Main Line Times" (1998). *1998 Decisions.* Paper 61.
http://digitalcommons.law.villanova.edu/thirdcircuit_1998/61

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1998 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 31, 1998

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 97-1169

THE FAIR HOUSING COUNCIL OF SUBURBAN
PHILADELPHIA,
        Appellant

v.

MAIN LINE TIMES; ACME NEWSPAPERS, INC.*

*Amended per Clerk's Order of April 9, 1997

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civ. No. 96-cv-01379)

Argued
September 9, 1997

Before: MANSMANN and NYGAARD, Circuit Judges and
BLOCH, District Judge.*

(Filed March 31, 1998)

Clifford A. Boardman, Esquire
 (ARGUED)
Two Penn Center, Suite 1920
Philadelphia, PA 19102

 Counsel for Appellant

_____

*Honorable Alan N. Bloch of the United States District Court for the
Western District of Pennsylvania, sitting by designation.

Gregory M. Harvey, Esquire
 (ARGUED)
Lisa A. Mathewson, Esquire
Morgan, Lewis & Bockius LLP
2000 One Logan Square
Philadelphia, PA 19103-6996

 Counsel for Appellees

Elaine R. Jones
Director-Counsel
Norman J. Chachkin, Esquire
David T. Goldberg, Esquire
Paul K. Sonn, Esquire
NAACP Legal Defense and
 Educational Fund, Inc.
99 Hudson Street
Suite 1600
New York, NY 10013

Judith A. Browne
Peter F. Rundlet
NAACP Legal Defense and
 Educational Fund, Inc.
1275 K Street, N.W.
Suite 301
Washington, DC 20005

Counsel for Amicus Curiae
The NAACP Legal Defense &
Educational Fund, Inc.

William G. Scarborough, Esquire
Stradley, Ronon, Stevens & Young,
 LLP
2600 One Commerce Square
Philadelphia, PA 19103

Karen L. Black, Esquire
Public Interest Law Center of
 Philadelphia
125 South Ninth Street
Suite 700
Philadelphia, PA 19107

Counsel for Amicus Curiae Fair
Housing Action, Fair Housing
Council of Montgomery County,
Fair Housing Council of Southern
New Jersey, Fair Housing
Partnership Of Greater Pittsburgh,
Housing Consortium for Disabled
Individuals, and Housing Council
of York

John P. Relman, Esquire
Washington Lawyers' Committee for
Civil Rights and Urban Affairs
1300 19th Street, N.W.
Washington, DC 20005

James R. Bird, Esquire
Dona J. Martin, Esquire
Timothy G. Lynch, Esquire
Shea & Gardner
1800 Massachusetts Avenue, N.W.
Washington, DC 20036

Counsel for Amicus Curiae The
National Fair Housing Alliance

OPINION OF THE COURT

MANSMANN, Circuit Judge.

In this action brought pursuant to the Fair Housing Act, 42 U.S.C. S 3604, The Fair Housing Council of Suburban Philadelphia ("FHC") appeals an order of the district court granting a motion for judgment notwithstanding the verdict filed by Acme Newspapers, Inc. ("Acme"), its publication, The Main Line Times, and the paper's publisher. The district court granted this motion based on its conclusion that the FHC lacked standing under Article III of the United States Constitution to maintain this suit. Because we agree that the FHC failed to establish any "perceptible impairment" to its operation caused by the alleged discrimination and thus failed to satisfy the minimum standing requirements

3

embodied in Article III, we will affirm the order of the district court.

I.

The FHC, a fair housing group which has operated in the Philadelphia area for more than forty years, describes itself as a non-profit organization whose "purpose is to educate and promote fair housing and to oppose segregation based on the protected classes found in the Fair Housing Act of 1968, as amended."

On February 21, 1996, the FHC filed eleven lawsuits in federal court, nine of which charged various newspaper publishers and related defendants with violations of the Fair Housing Act, 42 U.S.C. S 3604.1  In this suit, the FHC sought damages for injuries alleged to have been caused by real estate advertisements placed in the Main Line Times on a number of occasions during 1994 and 1995. In its complaint, the FHC alleged that:

>       On or about December, 1994 through at least
>       November, 1995, defendants approved and published

_____

1. 42 U.S.C. S 3604(c) of the Fair Housing Act makes it unlawful:

>       To make, print, or publish, or cause to be made, printed, or
>       published any notice, statement, or advertisement with respect to
>       the sale or rental of a dwelling that indicates any preference,
>       limitation, or discrimination based on race, color, religion, sex,
>       handicap, familial status, or national origin or an intention to
make
>       any such preference, limitation, or discrimination.

The Act provides that "an aggrieved person may commence a civil action in an appropriate United States district court . . ..", S 3613(a)(1)(4), and
defines an "aggrieved person" (including corporations and associations) as:

>       Any person who--
>
>       (1) claims to have been injured by a discriminator y housing
>       practice; or
>
>       (2) believes that such person will be injured by a  discriminatory
>       housing practice that is about to occur.

Section 3602(I).

4

> real estate advertisements that stated "no children,"
> "three persons," as well as, upon information and
> belief, many other advertisements which indicated a
> preference or limitation on the basis of familial status.

The case was tried before a jury in December, 1996. At that time, five advertisements were at issue. These advertisements contained the following allegedly discriminatory phrases 1) "no children;" 2) "3 persons;" 3) "ideal for couple or professional single;" 4) "(for one person);" and 5) "(for one person)." At t he close of all the evidence, Acme and the other defendants filed a motion for judgment as a matter of law, pursuant to Fed. R. Civ. P. 50. Acme contended that the FHC had failed to establish injury sufficient to satisfy the standing requirement imposed by Article III of the United States Constitution. The district court deferred ruling on this motion and submitted the case to the jury.

On December 4, 1996, the jury returned a verdict in favor of the FHC, awarding the FHC $25,000 in compensatory damages. On December 17, 1996, Acme renewed its Rule 50 motion, again arguing that the FHC lacked standing to pursue its claims under the Fair Housing Act. The district court granted this renewed motion on January 28, 1997, stating that it had"acted prematurely in submitting the case to the jury as[the FHC] did not have standing to bring any of the claims asserted in its Complaint." Fair Housing Council of Suburban Philadelphia v. Main Line Times, No. 96–1379, 1997 WL 30642 at *6 (E.D. Pa. Jan 27, 1997). This timely appeal followed.

II.

This appeal requires that we revisit, albeit in a different context, the identical issue raised in Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers, No. 97–1051 (3d Cir. March 31, 1998): whether the FHC has shown "distinct and palpable" injury sufficient to satisfy Article III standing requirements under the Fair Housing Act. Resolution of this question turns on the application of constitutional standing requirements. We reviewed the

5

parameters of these requirements at length in our opinion in Montgomery Newspapers, and will not repeat that discussion here.

We begin our examination of the issue before us by noting that Article III principles governing standing are by now well-settled. In Lujan v. Defenders of Wild Life, 540 U.S. 555, 560, the Supreme Court summarized the law of standing as follows:

> Over the years, our cases have established that the irreducible constitutional minimum of standing contains three elements. First the plaintiff must have suffered an "injury in fact" -- an invasion of a legally protected interest which is a) concrete and particularized, and b) "actual or imminent, not `conjectural' or `hypothetical.' " Second, there must be a causal connection between the injury and the conduct complained of -- the injury has to be"fairly . . . trace[able] to the challenged action of the defendant and not . . . th[e] result [of] the independent action of some third party not before the court." Third, it must be "likely" as opposed to merely "speculative," that the injury will be "redressed by a favorable decision."

(Citations omitted.) These requirements -- particularly the need for injury in fact -- were applied in the fair housing context in Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982). There, the Supreme Court wrote that:

> In determining whether [a fair housing organization] has standing under the Fair Housing Act, we conduct the same inquiry as in the case of an individual: Has the plaintiff " `alleged such a personal stake in the outcome of the controversy' as to warrant his invocation of federal court jurisdiction"? . . . If, as broadly alleged, petitioner's practices have perceptibly impaired [the organization]'s ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities -- with the consequent drain on the organization's

6

resources -- constitutes far more than simply a setback to the organization's abstract social interests.

455 U.S. at 378-79 (citations omitted) (emphasis added).

The caselaw establishes that in order to defeat the motion for judgment notwithstanding the verdict, the FHC was required to submit "evidence showing through specific facts . . . that . . . it [was] `directly' affected [by the alleged discrimination]." Lujan v. Defenders of Wild Life, 540 U.S. at 562 (emphasis added). "Since [the elements of standing] are not mere pleading requirements but rather an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e. with the manner and degree of evidence required at the successive stages of the litigation." Id. at 561. Despite the jury verdict in the FHC's favor, the district court concluded that the FHC failed to meet its burden of proof, producing nothing of substance at trial to support the damage allegations set forth in the complaint.2 There was no "evidence upon which the jury could properly find a verdict for [the FHC]." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993).

_____

2. The complaint contains the following allegations bearing on injury:

> 9. [E]ach act of discrimination conducted in  the Delaware Valley causes a setback to the good work accomplished by the FHC's educational and outreach efforts and to the development of an integrated housing community. As a result, the FHC must launch further efforts to undo the damage that the discrimination has caused. In the case of widespread and broadly disseminated discrimination, such as occurs in the ongoing publication of a landlord's discriminatory advertisements, the further efforts required
> are a substantial drain on its resources and harms[sic] the FHC.

> 18. As a result of the conduct of the Defendants, persons were injured in their person and property. Specifically, families with children were barred from housing in violation of the Fair Housing Act of 1968 as amended. Further, the FHC is now forced to divert funds to counteract the discriminatory message and acts of Defendants, and has had its purpose frustrated by Defendants' discriminatory conduct.

These damage allegations are identical to those set forth in the complaint filed in Fair Housing Council v. Montgomery Newspapers.

7

Judgment as a matter of law is to be granted sparingly. We will affirm an order granting judgment as a matter of law "only if, viewing the evidence in the light most favorable to the nonmovant and giving it the advantage of every fair and reasonable inference . . . it is apparent that the verdict is not supported by legally sufficient evidence." Id. We have carefully reviewed the FHC's damage allegations and the evidence introduced to support them and are convinced that this is one of those rare cases where, following a jury verdict, judgment as a matter of law was warranted.

III.

The FHC alleges that it suffered impairment sufficient to establish Article III standing when it was forced to divert resources from counseling and other activities to: (1) an investigation designed to determine the existence and extent of on-going discrimination in advertising; (2) litigation; and (3) an educational campaign designed to counteract the discriminatory effect of the advertisements. We considered and rejected identical damage claims based on the need to divert funds to investigation and litigation in Montgomery Newspapers. As the "proof" offered on these issues is virtually identical to that offered and found lacking in Montgomery Newspapers, we need not detail that proof or repeat our analysis here.

Because, however, the evidence regarding the need for an educational campaign to counteract the alleged discrimination differs somewhat from that offered in Montgomery Newspapers, we address it briefly. At trial, the FHC's Executive Director sought to establish that the FHC had suffered injury sufficient to satisfy Article III by offering the following testimony:

> For [forty years, the FHC] educates. We go out to all kinds of organizations, groups . . . and educate them about their rights to obtain housing on a non-discriminatory basis. We also spend a tremendous amount of time educating the industry. . . . So, when these ads appear in the paper and even if it's only one ad, it sort of undoes -- not sort of, it definitely undoes all that good work, all that hard work, all that

8

education. Its back to where we started from. It's as though we never did this. It's broadcast to tens of thousands of people. First of all, people see it and think that they could be turned down for housing. Other Realtors, landlords, see this, think either the laws don't exist or they're not enforced. We havefiled complaints against people and they've come to us with dozens of ads from the newspaper that say, look, here's ads that say not children, no children, adults only, adults preferred, perfect for single. And they say, well, what's wrong? This is in the newspaper.

Q. Are you talking about people you've charged?

A. Yes.

Q. Okay.

A. -- people that we have filed complaints against.

Q. Like who?

A. Individual landlords . . . . So our job is to educate. And all this education goes down the drain when these ads appear in the paper.

While we can agree intuitively that continued publication of discriminatory advertising in general could have an adverse effect on public perception, thus making the job of the FHC more difficult, we are convinced that even were we to assume injury, the evidence submitted failed to establish the necessary "causal connection between the injury and the [particular advertisements]." Lujan v. Defenders of Wild Life, 540 U.S. at 560.

The evidence submitted by the FHC did not show that the advertisements at issue created any adverse effects upon families seeking housing or upon public perception of the advertisements' legality. The evidence offered was probative only as to the effect of discriminatory advertising generally on landlords and realtors. The testimony offered by the FHC with respect to the five specific advertisements failed to establish that they had been read by anyone outside the FHC or that the FHC was required to modify its operation in any way as a result of these advertisements.3 As Acme

_____

3. The dissent states that activities "falling between investigation and the filing of a lawsuit can constitute Article III injury . . . ." (Slip Opinion at

correctly observes, "No injury to the cause of fair housing --
or consequent impairment of the Council's programs --
could follow from the publication of advertising which was
only proven to have been observed by persons who knew
that it was illegal, i.e. the Council's staff members."

IV.

Faced with the difficulties inherent in its evidence, the
FHC takes the position that, because it holds the status of
a private attorney general, it need show nothing more than
a violation of the Act in order to establish Article III
standing. We disagree. The fact that a housing organization
is able to show that a particular advertisement violates the
Act is not sufficient to satisfy the requirements of Article III;
a violation of the Act does not automatically confer standing
on any plaintiff, even one who holds the status of a private
attorney general. An organization acting as a private
attorney general is relieved only of prudential limitations on
standing and may bring suit to enforce the rights of others
only where the organization itself is able to demonstrate that
it has suffered injury in fact. See Lujan, 504 U.S. at 572-73
(requiring that an organization holding status of private
attorney general show injury in fact). The required
demonstration of legally cognizable injury is absent in this
case. Although we have given serious consideration to the
jury's verdict and award of compensatory damages in favor
of the FHC, our analysis of the record compels us,
nonetheless, to conclude that the record is devoid of
"evidence upon which the jury could properly [have found

_____

15). The dissent concludes that the FHC suffered such an injury when
it devoted resources to holding a press conference "to publicize the
newspaper's violation of the Fair Housing Act." Id. The testimony of an
FHC representative establishes that this "press conference was held to
announce the filing of [eleven] lawsuits . .. so that we could get the
message out . . . that the type of ads that appear in the Main Lines
Times . . . are in violation of the Fair Housing Act." We have not found
any case which has held that a press conference announcing the filing
of lawsuits might be sufficient to establish Article III injury. To adopt
this
radical view of injury would effectively nullify the Article III standing
requirement.

10

a] verdict for [the FHC]." Lightning Lube, Inc., 4 F.3d at 1166.

V.

In concluding that the strictures of Article III bar the FHC from maintaining this suit, we emphasize here, as we did in Montgomery Newspapers, that the goal of "eliminating discrimination in housing is vitally important." (Slip Opinion at 18.) Even this laudable objective does not, however, warrant an evisceration of Article III. As Acme points out:

> [T]he most impassioned public policy arguments cannot eliminate the case or controversy requirement from the Constitution. If anything, the appeal to public policy should highlight . . . the separation of powers rationale from which the case or controversy doctrine flows. Adjudicating actual controversies, not legislating social policy, is the province of the judiciary.

Our adherence to the requirements of Article III should not impede vigorous enforcement of the Fair Housing Act. The caselaw is replete with examples of housing organizations which have successfully established injury sufficient to carry them over the Article III threshold. As we observed in Montgomery Newspapers, "It should not be insurmountably difficult for these organizations to establish standing either in their own right or on behalf of their members by referring to well-established standing principles and adjusting their pleadings and proof accordingly." (Slip Opinion at 18.)

VI.

For the foregoing reasons, we will affirm the order of the district court.

11

NYGAARD, Circuit Judge, dissenting

This appeal raises the identical issue presented in Fair Housing Council of Suburban Philadelphia v. Montgomery Newspapers, No. 97-1051 (3d Cir. 1998). Again, I respectfully dissent.

The FHC has standing to sue The Main Line Times under 42 U.S.C. S 3604(c) because it has shown the threshold injury that is required under Article III, Section 2 of the Constitution. At trial the FHC demonstrated that it must redirect resources to an educational campaign to inform landlords, real estate agents, housing providers, and consumers that discrimination based on family status violates 42 U.S.C. S 3604(c). The FHC held a press conference to advise, among others, housing providers and consumers that the advertisements in The Main Line Times violated the Fair Housing Act. The FHC further demonstrated the ignorance of housing providers, who continue to attempt to submit illegal advertisements, and the need for an educational campaign for the housing industry and for the defendant itself, who continued to publish illegal advertisements and to promote misunderstanding about the familial status provisions of the Fair Housing Act. The majority mistakenly concludes that the FHC has not demonstrated the need for an educational campaign. In support of its holding, the majority repeats its characterization of the FHC's evidence from the Montgomery Newspapers case. As I concluded in Montgomery Newspapers, the majority's depiction of the evidence is incorrect. The district court concluded that the advertisements were not the cause of any programmatic changes the FHC may have made. Again, I disagree; the FHC is only required to show that its injury is fairly traceable to the actions of the defendant. Furthermore, the FHC has demonstrated standing for costs incurred investigating and applying legal pressure to The Main Line Times. The majority does not discuss this as it pertains to the evidence submitted in this case; but because it relies on its conclusion in the Montgomery Newspapers case, I reiterate my disagreement with that conclusion here.

12

I. Standard of Review

This is an exceptional case in which the district court granted judgment as a matter of law following a jury verdict of $25,000 in favor of the FHC. Generally, courts grant judgment as a matter of law sparingly, and give the nonmoving party every fair and reasonable inference before concluding that the verdict was not supported by legally sufficient evidence. Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993). The majority misapplies this standard, and credits only one passage of testimony in support of the FHC's position. We have held that a case is properly submitted to a jury unless it is "critically deficient of that minimum quantum of evidence from which the jury might reasonably afford relief." Link v. Mercedes-Benz of N. Am., Inc., 788 F.2d 918, 921 (3d Cir. 1986). A review of the record plainly reveals sufficient evidence to support a verdict in favor of the FHC.

II. Educational Injury

The Supreme Court held in Havens Realty Corp. v. Coleman, 455 U.S. 363, 372, 102 S. Ct. 1114, 1121 (1982), that the plaintiff organization had standing to sue if the activity that allegedly violated the Fair Housing Act perceptibly impaired counseling and referral services. This impairment meets the "injury in fact" test because a concrete and demonstrable drain on resources is a more plausible injury than a conjectural "setback" to an organization's abstract social interests. Id. at 379 (distinguishing Sierra Club v. Morton, 405 U.S. 727, 92 S. Ct. 1361 (1972)). The courts of appeals interpreting Havens agree that diversion of resources to educational programs is sufficient to impart Article III standing. See, e.g., Fair Employment Council of Greater Washington, Inc. v. BMC Mktg. Corp., 28 F.3d 1268, 1276-77 (D.C. Cir. 1994); Housing Opportunities Made Equal, Inc. v. Cincinnati Enquirer, Inc., 943 F.2d 644 (6th Cir. 1991); Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990). An "identifiable trifle" of this type of injury will suffice to confer standing upon the FHC, even when the proceedings have advanced to trial. United States v. Students Challenging Regulatory Agency Procedures, 412 U.S. 669, 689 n.14, 93

13

S. Ct. 2405, 2417 n.14 (1973) (rejecting the argument that standing should be limited to those significantly injured, and ruling that any level of injury is sufficient to confer standing). The FHC has clearly met its burden by showing sufficient evidence of injury.

The FHC held a press conference to inform consumers and the housing industry that the discriminatory advertisements that appeared in The Main Line Times violated the Fair Housing Act. Jan Chadwick, Assistant Director of the FHC, testified to the detailed plan to educate housing providers and consumers about the Fair Housing Act's family status provisions, and explained a specific proposal for newspaper campaign. The FHC also presented evidence of the additional costs associated with the newspaper campaign.

The FHC has also shown that its educational plan is a necessary response to the discriminatory advertisements that appeared in The Main Line Times because individuals seeking to place advertisements, as well as those responsible for publishing the ads, misunderstood the family status provisions of the Fair Housing Act. The illegal advertisements at issue in this lawsuit were accepted into publication by the trained staff of The Main Line Times advertising department. Frequently, individuals placing housing advertisements insisted on illegal wording, telling newspaper staff members to "take it or leave it," and the paper would sometimes have to reject ads because the individual placing it refused to comply with the Fair Housing Act. The FHC educational plan, and specifically the press conference the FHC already held, attempted to dispel misconceptions about the Fair Housing Act that housing providers might have developed from reading the illegal advertisements in The Main Line Times.

III. Investigation Injury

Time spent reviewing the newspaper for illegal housing advertisements can constitute Article III injury. Havens found "injury in fact" when a fair housing organization had to divert resources to "identify and counteract" discriminatory practices. 455 U.S. at 379, 102 S. Ct. at

14

1124. Like "educational injury," the courts following Havens agree that costs incurred investigating violations of the Fair Housing Act can confer standing. See, e.g., Hooker v. Weathers, 990 F.2d 913, 915 (6th Cir. 1993) (costs incurred in the investigation to confirm the facts and circumstances).

Viewing the evidence of the two alternative Article III factors, investigation and litigation injury, there is at least a minimum quantum of evidence required to show injury. Here, the FHC demonstrated that it diverted resources to review The Main Line Times to identify violations of the Fair Housing Act.

IV. Litigation Injury

I restate my conclusion from my dissent in Montgomery Newspapers that activities falling between investigation and the filing of the lawsuit can constitute Article III injury to an organization under Havens. My decision to confer standing upon fair housing organizations for enforcement activities, other than the filing of the lawsuit, does not conflict with the Court of Appeals for the D.C. Circuit's cases that the majority finds persuasive. Those cases only prohibit conferral of standing for the act of filing the lawsuit. See Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268 (D.C. Cir. 1994); Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990).

The FHC testified to the activities it had to postpone when it dedicated resources to enforcement activities arising from The Main Line Times advertisements. (Direct of James Berry, J.A. at 208-209.) The FHC chose non-litigation methods to apply legal pressure upon The Main Line Times to enforce the Fair Housing Act, including filing a complaint with the Pennsylvania Human Resources Commission (J.A. at 855) and holding a press conference to publicize the newspaper's violations of the Fair Housing Act.

V. Causation

The district court held, and the majority agrees, that the FHC could not show that the alleged injury was caused by

15

any illegal advertisements published by the Main Line Times. I disagree. For standing purposes, a plaintiff is required to show that its injury is "fairly traceable" to the defendant's actions. Public Interest Research Group of New Jersey, Inc. v. Powell Duffryn, 913 F.2d 64, 71 (3d Cir. 1990). Tort causation is not required by Article III, and a plaintiff, even at the trial stage, does not have to prove injury for standing purposes with scientific certainty. Id. at 73 n. 10.

The FHC was able to specifically connect the advertisements at issue in this lawsuit to the press conference. Likewise, the FHC was able to associate its investigation and litigation injuries to the specific advertisements that were the ultimate subject of the lawsuit.

VI. Conclusion

For all the foregoing reasons, including the reasons set forth in my Montgomery Newspapers dissent, I conclude that the FHC has standing to advance a claim under 42 U.S.C. S 3604(c). I would reverse the district court and reinstate the $25,000 verdict in favor of the FHC and against The Main Line Times.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

16